AUSAs: Andrew K. Chan, James Ligtenberg, and Ni Qian

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

HENRY YAU,

                    Defendant.

# 24 MAG 4055

## SEALED COMPLAINT

Violations of 18 U.S.C. §§ 1028(f), 371, 641, 2; 5 U.S.C. § 552a(i)(1)

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

ROBIEL ANDE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Identity Theft Conspiracy)

1.      From at least in or about 2019 through at least in or about 2020, in the Southern District of New York and elsewhere, HENRY YAU, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit identity theft, in violation of Title 18, United States Code, Section 1028(a)(7).

2.      It was a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, would and did knowingly transfer, possess, and use, in and affecting interstate and foreign commerce, without lawful authority, a means of identification of another person, to wit, names, social security numbers, dates of birth, and drivers' license numbers, with the intent to commit, and to aid or abet, and in connection with, an unlawful activity that constitutes a violation of Federal law, to wit, conversion of records and property of the United States, in violation of Title 18, United States Code, Section 641, and disclosure of agency records containing individually identifiable information, in violation of Title 5, United States Code, Section 552a(i)(1), and conspiracy to commit the same, and the offense involved the transfer of an identification document, authentication feature, and false identification document that is and appears to be an identification document and authentication feature issued by and under the authority of the United States, and a birth certificate, and a driver's license and personal identification card, and as a result of the offense involving the transfer, possession, and use of one and more means of identification, an individual committing the offense, obtained a thing of value aggregating $1,000 and more during a one-year period, in violation of Title 18, United States Code, Sections 1028(a)(7), (b)(1)(A), and (b)(1)(D).

(Title 18, United States Code, Section 1028(f).)

## COUNT TWO
### (Conspiracy to Convert Records and Property of the United States and Disclose Agency Records Containing Individually Identifiable Information)

3.        From at least in or about 2019 through at least in or about 2020, in the Southern District of New York and elsewhere, HENRY YAU, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, conversion of records and property of the United States, in violation of Title 18, United States Code, Section 641, and disclosure of agency records containing individually identifiable information, in violation of Title 5, United States Code, Section 552a(i)(1).

4.        It was a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, would and did embezzle, steal, purloin, and knowingly convert to their use and the use of another, and without authority, sell, convey, and dispose of, a record and thing of value of the United States and a department and agency thereof, in violation of Title 18, United States Code, Section 641.

5.        It was further a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, being an officer and employee of an agency, who by virtue of such employment and official position, had possession of, and access to, agency records which contained individually identifiable information the disclosure of which was prohibited by Title 5, United States Code, Section 552a, and by rules and regulations established thereunder, and who knowing that disclosure of the specific material was so prohibited, would and did willfully disclose the material in a manner to a person and agency not entitled to receive it, in violation of Title 5, United States Code, Section 552a(i)(1).

### Overt Acts

6.        In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.        On or about August 27, 2019, a co-conspirator named Tommy Lin transmitted a photocopy of the Delaware driver's license for a particular individual to HENRY YAU, the defendant, for the purpose of inquiring whether YAU could arrest that particular individual for immigration violations.

b.        On or about June 1, 2020, Lin received a photograph of an Illinois driver's license for a particular individual ("Victim-1"), which Lin later transmitted to YAU for the purpose of inquiring whether YAU could arrest Victim-1 for immigration violations.

c.        On or about September 8, 2020, YAU disclosed to Lin a copy of a United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement

2

("ICE"), Enforcement and Removal Operations Field Operations Worksheet containing Victim-1's name, driver's license photograph, criminal history, and home address.

       d.    On or about October 28, 2020, YAU arrested Victim-1 and transmitted copies of post-arrest photographs of Victim-1 to Lin.

(Title 18, United States Code, Section 371.)

**<u>COUNT THREE</u>**
**(Conspiracy to Convert Records and Property of the United States and**
**Disclose Agency Records Containing Individually Identifiable Information)**

       7.    From at least in or about 2018 through at least in or about 2021, in the Southern District of New York and elsewhere, HENRY YAU, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, conversion of records and property of the United States, in violation of Title 18, United States Code, Section 641, and disclosure of agency records containing individually identifiable information, in violation of Title 5, United States Code, Section 552a(i)(1).

       8.    It was a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, would and did embezzle, steal, purloin, and knowingly convert to their use and the use of another, and without authority, sell, convey, and dispose of, a record and thing of value of the United States and a department and agency thereof, in violation of Title 18, United States Code, Section 641.

       9.    It was further a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, being an officer and employee of an agency, who by virtue of such employment and official position, had possession of, and access to, agency records which contained individually identifiable information the disclosure of which was prohibited by Title 5, United States Code, Section 552a, and by rules and regulations established thereunder, and who knowing that disclosure of the specific material was so prohibited, would and did willfully disclose the material in a manner to a person and agency not entitled to receive it, in violation of Title 5, United States Code, Section 552a(i)(1).

<u>Overt Acts</u>

       10.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

       a.    On or about February 23, 2019, a co-conspirator not named herein ("CC-1") transmitted to HENRY YAU, the defendant, a photograph of a New York State driver's license in the name of an individual ("Victim-2"), and asked YAU to check on the status of a permanent

3

residence application filed by Victim-2 with the U.S. Citizenship and Immigration Services ("USCIS").

        b.      On or about March 20, 2019, YAU disclosed to CC-1 non-public information regarding USCIS's investigation of Victim-2's permanent residence application.

        c.      On or about June 20, 2019, CC-1 transmitted to YAU a photograph of a driver's license in the name of an individual ("Victim-3") and asked YAU to check on the immigration status of Victim-3 in DHS databases.  Later that day, YAU transmitted to CC-1 non-public information about Victim-3's immigration status.

        d.      On or about October 12, 2021, CC-1 requested that YAU conduct a check in DHS databases for the travel history for a particular individual, and YAU offered to ask other individuals for assistance with conducting the database checks.

(Title 18, United States Code, Section 371.)

<b><u>COUNT FOUR</u></b><br>
<b>(Conspiracy to Convert Records and Property of the United States and<br>
Disclose Agency Records Containing Individually Identifiable Information)</b>

11.    From at least in or about 2019 through at least in or about 2020, in the Southern District of New York and elsewhere, HENRY YAU, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, conversion of records and property of the United States, in violation of Title 18, United States Code, Section 641, and disclosure of agency records containing individually identifiable information, in violation of Title 5, United States Code, Section 552a(i)(1).

12.    It was a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, would and did embezzle, steal, purloin, and knowingly convert to their use and the use of another, and without authority, sell, convey, and dispose of, a record and thing of value of the United States and a department and agency thereof, in violation of Title 18, United States Code, Section 641.

13.    It was further a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, being an officer and employee of an agency, who by virtue of such employment and official position, had possession of, and access to, agency records which contained individually identifiable information the disclosure of which was prohibited by Title 5, United States Code, Section 552a, and by rules and regulations established thereunder, and who knowing that disclosure of the specific material was so prohibited, would and did willfully disclose the material in a manner to a person and agency not entitled to receive it, in violation of Title 5, United States Code, Section 552a(i)(1).

4

<u>Overt Acts</u>

14.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about December 26, 2018, YAU conducted a check in law enforcement databases at the request of a co-conspirator not named herein ("CC-2") to see whether CC-2 would be arrested by law enforcement at the border when traveling out of the United States.

b.    On or about February 22, 2019, YAU conducted a check in law enforcement databases at CC-2's request to see whether CC-2's cousin would be arrested by law enforcement at the border when traveling into the United States.

c.    On or about January 13, 2020, YAU conducted a check in law enforcement databases at CC-2's request to see whether CC-2 would be arrested by law enforcement at the border when traveling into the United States.  YAU informed CC-2 that CC-2 was flagged as being investigated by law enforcement agents in California.

(Title 18, United States Code, Section 371.)

## COUNT FIVE
### (Conspiracy to Convert Records and Property of the United States and Disclose Agency Records Containing Individually Identifiable Information)

15.    From at least in or about 2019 through at least in or about 2020, in the Southern District of New York and elsewhere, HENRY YAU, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, conversion of records and property of the United States, in violation of Title 18, United States Code, Section 641, and disclosure of agency records containing individually identifiable information, in violation of Title 5, United States Code, Section 552a(i)(1).

16.    It was a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, would and did embezzle, steal, purloin, and knowingly convert to their use and the use of another, and without authority, sell, convey, and dispose of, a record and thing of value of the United States and a department and agency thereof, in violation of Title 18, United States Code, Section 641.

17.    It was further a part and object of the conspiracy that HENRY YAU, the defendant, and others known and unknown, being an officer and employee of an agency, who by virtue of such employment and official position, had possession of, and access to, agency records which contained individually identifiable information the disclosure of which was prohibited by Title 5, United States Code, Section 552a, and by rules and regulations established thereunder, and who knowing that disclosure of the specific material was so prohibited, would and did willfully disclose the material in a manner to a person and agency not entitled to receive it, in violation of Title 5, United States Code, Section 552a(i)(1).

Overt Acts

18.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    Between on or about June 18, 2019 and on or about June 19, 2019, HENRY YAU, the defendant, disclosed to a co-conspirator not named herein ("CC-3") non-public information from DHS databases regarding the immigration status of an individual ("Victim-4") and offered to arrest Victim-4 and Victim-4's spouse.

b.    On or about June 19, 2019, YAU checked DHS databases at CC-3's request and provided non-public information from DHS databases regarding the immigration status of an individual ("Victim-5").

c.    Between on or about July 25, 2019 and on or about July 26, 2019, YAU checked law enforcement databases at CC-3's request to obtain subscriber information for a particular phone number.

d.    On or about July 28, 2019, CC-3 transmitted a photograph of a Hong Kong Permanent Identity Card of a particular individual ("Victim-6") and asked YAU to provide recent border crossings into and out of the United States for Victim-6.

e.    On or about July 30, 2019, YAU disclosed to CC-3 non-public information from law enforcement databases about Victim-6's border crossings into and out of the United States.

f.    On or about July 23, 2021, YAU disclosed to CC-3 non-public information from a DHS database about the investigation of CC-3's application for the DHS Global Entry Program.

(Title 18, United States Code, Section 371.)

## COUNT SIX
**(Conversion of Records and Property of the United States)**

19.    From at least in or about November 2019 through at least in or about 2023, in the Southern District of New York and elsewhere, HENRY YAU, the defendant, embezzled, stole, purloined, and knowingly converted to his use and the use of another, and without authority sold, conveyed, and disposed of, a record and thing of value of the United States and a department and agency thereof, to wit, YAU disclosed to friends and acquaintances records from various law enforcement databases and immigration databases maintained by, among other departments and agencies, DHS, ICE, the Department of Justice, U.S. Citizenship and Immigration Services ("USCIS"), and U.S. Customs and Border Protection.

(Title 18, United States Code, Sections 641 and 2.)

## COUNT SEVEN
### (Disclosure of Agency Records Containing Individually Identifiable Information)

20.     From at least in or about November 2019 through at least in or about 2023, in the Southern District of New York and elsewhere, HENRY YAU, the defendant, being an officer and employee of an agency, who by virtue of such employment and official position, had possession of, and access to, agency records which contained individually identifiable information the disclosure of which was prohibited by Title 5, United States Code, Section 552a and by rules and regulations established thereunder, and who knowing that disclosure of the specific material was so prohibited, would and did willfully disclose the material in a manner to a person and agency not entitled to receive it, in violation of Title 5, United States Code, Section 552a(i)(1), to wit, YAU disclosed to friends and acquaintances records containing individually identifiable information from various law enforcement databases and immigration databases maintained by, among other departments and agencies, DHS, ICE, the Department of Justice, U.S. Citizenship and Immigration Services, and U.S. Customs and Border Protection.

(Title 5, United States Code, Section 552a(i)(1); and Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

21.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Asian and African Organized Crime Squad.  I have received training about, and participated in investigations of, financial crimes, conversion of government records, and unlawful dissemination of confidential government information.  I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## OVERVIEW

22.     Based on my review of law enforcement records, I know that HENRY YAU, the defendant, was employed until in or about November 2024 as a Supervisory Deportation Officer with ICE, which is a law enforcement agency within DHS.  ICE's stated mission includes protecting the United States through criminal investigations and enforcing immigration laws to preserve national security and public safety.  YAU was hired as an ICE Deportation Officer in or around 2015.  In or around September 2021, YAU was promoted to Supervisory Deportation Officer.  YAU resigned from ICE in or about November 2024.  At all relevant times, YAU was assigned to the ICE New York Field Office, which is located in Manhattan.  As an ICE Deportation Officer, YAU was given access to several password-protected law enforcement databases operated by DHS and other law enforcement agencies, including USCIS databases containing the status of immigration-related applications filed by aliens, CBP databases containing information about border crossings, criminal history databases, and ICE databases containing records relating to arrests and removals of aliens from the United States.

7

23.     As further discussed below, this investigation has revealed that, from at least in or about 2017 through at least in or about 2023, HENRY YAU, the defendant, participated in a scheme to disseminate confidential government information from law enforcement databases, including multiple databases maintained by ICE, CBP, and USCIS.  YAU disseminated this confidential government information to friends and acquaintances for his own personal and financial gain.  For example, between in or about 2019 and in or about 2020, YAU agreed to and did disclose confidential information from law enforcement databases about an individual ("Victim-1") that a co-conspirator named Tommy Lin was seeking to have arrested and deported from the United States on behalf of members of a bank fraud conspiracy charged in the Southern District of New York in the case *United States v. Tommy Lin et al.*, S7 23 Cr. 572 (CM).[1]  YAU shared with Lin a copy of a Field Operations Worksheet containing personal identifying information about Victim-1 prior to arresting Victim-1, and YAU also sent Lin photographs of Victim-1 following the arrest.    In total, YAU has improperly disseminated confidential government information relating to approximately 28 individuals, at least.  This information came from DHS databases, and YAU disclosed it without any apparent law enforcement purpose to at least approximately 12 non-law enforcement personnel, including, among others: (1) Lin—a former Director of Constituent Services within the New York City Mayor's Office, (2) a former candidate for New York City Council and New York State Assembly ("CC-1"); (3) a former target of a fraud investigation being conducted by the FBI in California ("CC-2"); and (4) a former business partner ("CC-3").

<u>HENRY YAU's Dissemination of Confidential Government Information to Tommy Lin</u>

24.     Based on my personal participation in this investigation, I know that Tommy Lin previously served as a Director of Constituent Services in the New York City Mayor's Office between in or around 2014 and in or around 2019, and later became Queens Community Coordinator for the New York City Department of Environmental Protection between in or around January 2019 and 2024.

25.     On or about June 6, 2024, a grand jury in the Southern District of New York returned an Indictment, S7 23 Cr. 572 (CM), charging Lin with participating in a bank fraud conspiracy, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. § 1028A, relating to Lin's participation in a scheme to steal money from banks by using Chinese nationals to open bank accounts at various banks that were then used to file false reports of fraudulent transactions, which resulted in credits being transferred to the accounts.  The S7 23 Cr. 572 (CM) Indictment alleges that Lin participated in the bank fraud conspiracy by, among other things, accepting $20,000 in cash in exchange for arranging for an ICE Deportation Officer to arrest a disgruntled accountholder who had previously participated in the scheme.

---

[1] As of the date of this Complaint, Lin is charged with participating in a bank fraud conspiracy, in violation of 18 U.S.C. § 1349, and aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2.

26.    As further described below, HENRY YAU, the defendant, was the ICE Deportation Officer who assisted Lin in arresting and deporting Victim-1 on behalf of two members of the bank fraud conspiracy ("CC-4" and "CC-5"). In doing so, YAU disclosed sensitive law enforcement information to Lin, including an ICE Field Operations Worksheet containing personal identifying information about Victim-1.

27.    Based on my review of text messages exchanged between members of the bank fraud conspiracy, I know that CC-4 and CC-5 exchanged text messages with each other regarding assistance that Tommy Lin was providing to the bank fraud scheme, including Lin's offers to refer individuals that could participate in the scheme by opening bank accounts, check law enforcement databases for CC-4 and CC-5, and arrange for the arrest of other individuals at the request of CC-4 and CC-5. In exchange for this assistance, CC-4 and CC-5 described providing cash payments to Lin, including paying Lin to arrange for the arrest and deportation of Victim-1, who was a disgruntled member of the bank fraud scheme.

28.    Based on my personal participation in this investigation, I know that law enforcement officers executed a search warrant for an Apple iCloud account used by CC-4, which contained messages exchanged between CC-4 and CC-5 about Tommy Lin's involvement in the scheme to deport Victim-1. Additionally, CC-5 would frequently forward to CC-4 screenshots of messages between CC-5 and Lin.

     a.    Below are some of the relevant messages about the scheme that CC-4 and CC-5 exchanged on or about November 17, 2019 using WeChat, which is an encrypted messaging platform with servers based in China:[2]

| From | Translation |
|------|-------------|
| CC-5 | We need to meet up with Tommy next week |
| CC-5 | He used to work in the New York Mayor's office as the director. Now he works in the environmental protection agency, not sure about the title. He also holds a title at the immigration office. |
| CC-5 | He may have a chance to be in the white house after the change of term. |
| CC-5 | If we have SSNs, we can get IDs. Then we can find people from Taiwan to come here. Things will be simple. |

     b.    CC-5 then sent a screenshot of Tommy Lin's business card, indicating that Lin serves as a "Senior Advisor" within the New York City Police Department's ("NYPD") Asian Advisory Council.

     c.    On or about June 1, 2020, CC-5's WeChat Account sent to CC-4's WeChat Account a screenshot of text messages with Tommy Lin regarding assistance with deporting Victim-1 who "owes bank money" because of concerns that "he may report us to the

---

[2] Unless otherwise noted, messages sent between CC-4, CC-5, and Lin are in Chinese, and draft English translations are provided here.

police." CC-5 asked Lin: "Is there any way to keep his mouth shut and deport him directly?" CC-5's WeChat Account also sent to CC-4's WeChat Account a screenshot of messages sent to Lin containing Victim-1's driver's license and social security card.

      d.    The CC-5 WeChat Account and the CC-4 WeChat Account then exchanged a series of messages discussing the plan to arrest Victim-1 between in or around June 2020 and in or around September 2020, including messages indicating that Tommy Lin would need to be paid $20,000 to arrange for the arrest and deportation of Victim-1:

| From | Date/Time | Translation |
|------|-----------|-------------|
| CC-5 | 6/1/2020 8:36:18 PM(UTC+0) | I finished venting to [nickname of co-conspirator not named herein]. Tommy said it would be $20,000. I want to mess with him. I did everything I promised him, gave him all the money. He still wants to act shamelessly.  So he can't blame me for being heartless. |
| CC-5 | 6/1/2020 8:37:59 PM(UTC+0) | Can you find [Victim-1]'s SSNs and DOB? |
| CC-4 | 6/1/2020 8:38:14 PM(UTC+0) | I had a hard time finding it |
| CC-5 | 6/1/2020 8:39:04 PM(UTC+0) | We need to be clear with the two names and two sets of identification. If he dares to resist arrest, just shoot him. |
| CC-5 | 6/1/2020 9:07:27 PM(UTC+0) | I will ask Tommy to arrange the arrest. You help me get $10,000 and I will give $10,000. Let's take care of him! |
| CC-5 | 6/2/2020 12:57:35 PM(UTC+0) | I will meet Tommy in these couple of days. Tommy looked at the information and confirmed it could be an arrest. Once he got arrested: 1) the Immigration department can lock him up for six months, then court. If they find guns in his house, that will be five years. Every bullet will be a year. They will confiscate all the unexplained cash. 2) Tommy said if he wanted to report anyone to the immigration department, they wouldn't care. If they found guns in his house and sent him to the criminal court, he didn't have enough evidence to report anyone. Even if he gave them our photos, it would be useless because he didn't know how the back office operated. Also, he would be in more trouble if he told anyone about any of these. He needs at least $50,000 to make bail. |
| CC-5 | 6/3/2020 3:40:17 PM(UTC+0) | I will give money to Tommy first. After the arrest, you can use the thermometer balance[3] as the money you owe him. Don't give him the money and let him find a way to sell them. |
| CC-4 | 6/3/2020 3:41:03 PM(UTC+0) | That sounds great |
| CC-5 | 6/4/2020 12:31:35 PM(UTC+0) | If you can, get as much money as possible. [nickname of co-conspirator not named herein]'s wage is coming |

_____

[3] Based on my review of other text messages between CC-4 and CC-5, I know that there were discussions prior to this date about Tommy Lin's purchase of a large batch of thermometers from CC-4 and CC-5.

| | | up. I also gave Tommy $10,000 yesterday. I have no extra money to pay first. |
|---|---|---|
| CC-4 | 7/6/2020 7:45:45 PM(UTC+0) | How's [Victim-1]'s matter? |
| CC-5 | 7/6/2020 7:46:48 PM(UTC+0) | Immigration department is still not open yet. Once they are open, they will go arrest him. Now we have nowhere to lock him, he can get bail. Once the office is open, won't be able to make bail. |
| CC-5 | 7/6/2020 7:47:03 PM(UTC+0) | Tommy said they will arrest him in August for sure. |
| CC-5 | 7/6/2020 7:50:09 PM(UTC+0) | Tommy can arrest anyone with no papers here. There will be difficulties with green cards. If it's a citizen, that's pointless to arrest them, they can bail. |
| CC-5 | 8/16/2020 2:20:54 PM(UTC+0) | About [Victim-1], Tommy said they will arrest him either next week or the week after, we need to give him $10,000. |
| CC-5 | 9/11/2020 11:53:38 AM(UTC+0) | Tommy's people have been waiting for Victim-1 downstairs for two days already. If they arrest Victim-1, we will need to give Tommy $10,000 |

      e.     On or about October 28, 2020, the CC-5 WeChat Account sent a text message to the CC-4 WeChat Account, stating: "Caught him." The CC-5 WeChat Account then stated: "I told Tommy that I will send him the money in a few days. I said I am busy I don't have time." The CC-5 WeChat Account then sent to the CC-4 WeChat Account photographs of Victim-1 under arrest and sitting in an ICE holding cell:



      f.     The CC-5 WeChat Account also sent to the CC-4 WeChat Account messages sent by Tommy Lin to CC-5:

 

g.      On or about October 29, 2020, the CC-5 WeChat Account sent to the CC-4 WeChat Account an audio file in Mandarin that said, in sum and substance, that: (1) Lin wants to meet and get money; (2) Lin said not to show anyone the photos he sent because they are for internal use only, and all people involved will get penalized if the pictures became public.  The CC-4 WeChat Account also sent a screenshot from the ICE website indicating that Victim-1 was now detained at the Orange County Correctional Facility.

29.      Based on my review of records from ICE, I know that Victim-1 was arrested by ICE agents on or about October 28, 2020 in Flushing, New York, and then transported to 26 Federal Plaza in Manhattan for post-arrest processing.  The ICE arrest report was signed by HENRY YAU, the defendant, and included photographs matching the ones that Tommy Lin sent to CC-5.  ICE records also indicate that YAU prepared a "FIELD OPERATIONS WORKSHEET" on or about September 8, 2020 containing a summary of Victim-1's criminal history, Victim-1's home address, and an operational risk assessment, which also contained a photograph that appeared to be from Victim-1's driver's license.

30.      Based on my personal involvement in this investigation and my review of law enforcement reports, I know that on or about November 16, 2023, law enforcement agents executed a search warrant on electronic devices in Tommy Lin's possession.  During a search of Lin's cellphone, law enforcement officers found, among other things the following:

a.      Saved to Lin's cellphone on or about September 8, 2020 was a photograph of an individual holding what appears to be an excerpt of the "FIELD OPERATIONS WORKSHEET" that HENRY YAU, the defendant, prepared on that same date.  It thus appears that YAU provided to Lin a copy of the "FIELD OPERATIONS WORKSHEET"—a document labeled "LAW ENFORCEMENT SENSITIVE.  FOR OFFICIAL USE ONLY."

b.      On or about January 11, 2019, a photograph was saved to Lin's cellphone containing I-94 information (a form filled out by aliens entering the United States) with the

name, date of birth, and passport number of an individual who had most recently entered the country in or around August 2017 using a Chinese passport.

       c.     Lin's cellphone also contained text messages with a contact saved in the cellphone as "HENRY YAU" with a phone number, which, based on ICE records, was the number assigned to a government-issued cellphone being used at the time by YAU (the "YAU Government Cellphone").  In one text message exchange from on or about August 27-28, 2019, Lin appears to ask YAU whether a particular person in Delaware can be detained by ICE:

| From | Date/Time | Translation |
|------|-----------|-------------|
| Lin | 8/27/2019 7:51:11 PM(UTC+0) | Hey HENRY, Can you guys detain someone in Delaware? |
| Lin | 8/27/2019 7:51:15 PM(UTC+0) | [Photograph of Delaware Driver's License] |
| YAU | 8/27/2019 7:51:47 PM(UTC+0) | Is he in nyc? |
| YAU | 8/27/2019 7:52:06 PM(UTC+0) | If he's in another state I have to refer it to ICE in that state he resides |
| Lin | 8/27/2019 7:52:58 PM(UTC+0) | He is in another state. Currently not in NYC |
| Lin | 8/27/2019 8:21:30 PM(UTC+0) | I will try to get you more details. |
| YAU | 8/28/2019 11:14:12 AM(UTC+0) | Do you know his immigration status |
| YAU | 8/28/2019 11:15:25 AM(UTC+0) | I'll run him when I get back to the office |
| Lin | 8/28/2019 5:18:30 PM(UTC+0) | I am trying to get his A# |

       d.     Similarly, in another text message exchange, Lin appears to ask YAU whether he can check ICE databases for information about whether a "friend of mine" passed their citizenship interview.  Lin then transmits to YAU a person's name, date of birth, and alien registration number.  YAU then asks to connect with Lin via WeChat:

| From | Date/Time | Translation |
|------|-----------|-------------|
| Lin | 9/20/2019 5:24:04 PM(UTC+0) | A friend of mine went for interview a few weeks ago. Can you find out if the pass or not? |
| YAU | 9/20/2019 5:36:04 PM(UTC+0) | What's his name? |
| YAU | 9/20/2019 5:37:11 PM(UTC+0) | So I hope I can make it tonight but my schedule so far is really been busy. We have operation and next week I'm going to Africa for the week for depositions |
| YAU | 9/20/2019 5:37:14 PM(UTC+0) | Deporation |
| YAU | 9/20/2019 5:37:26 PM(UTC+0) | Deportations |
| Lin | 9/20/2019 5:41:28 PM(UTC+0) | Her name is [name of individual and date of birth] |
| YAU | 9/20/2019 5:43:06 PM(UTC+0) | Chinese guy? |
| Lin | 9/20/2019 5:44:01 PM(UTC+0) | Chinese girl |
| Lin | 9/20/2019 5:46:37 PM(UTC+0) | [alien registration number for individual] |
| YAU | 9/20/2019 5:51:54 PM(UTC+0) | Na man? |
| YAU | 9/20/2019 5:51:57 PM(UTC+0) | U got wechat? |
| Lin | 9/20/2019 5:52:24 PM(UTC+0) | Yes |
| YAU | 9/20/2019 5:52:46 PM(UTC+0) | What is it |

| Lin | 9/20/2019 5:52:57 PM(UTC+0) |  |
|---|---|---|

Based on my conversations with a DHS Office of Inspector General ("DHS-OIG") investigator, I know that audit trail records indicate that YAU's login credentials were used to conduct a search in DHS law enforcement databases for the individual described above on or about September 21, 2019.

31.    Based on my personal involvement in this investigation, my conversations with other law enforcement officers, and my review of recordings, I know that on or about June 5, 2024, law enforcement officers conducted an interview of HENRY YAU, the defendant, and executed a court-authorized search warrant for electronic devices in YAU's possession.  During this interview, YAU stated, among other things, the following:

a.    YAU had received information from Tommy Lin about an individual that was not in the country legally, and YAU then used information from Lin to conduct an arrest of that person.  YAU admitted that he "likely" and "probably" gave information from an ICE Field Operations Worksheet to Lin.

b.    YAU also admitted that he "likely" and "probably" accepted gifts from Lin—including a G-Shock watch, liquor, and dinners—although he claimed that these were gifts exchanged as part of a mutual friendship and were not bribes or gratuities.

c.    YAU denied that Lin or anyone else had ever attempted to get personal identifying information from him, agreeing that it would be an "egregious violation" for him to divulge personal identifying information from a government database to a third party.

d.    When asked about the WeChat messaging application, YAU also stated: "I stay away from that" and stated that he last used WeChat "years ago" and to the best of his knowledge had not communicated with Lin via WeChat.  Based on the evidence described in this Complaint, including the numerous text messages sent and received by YAU's cellphones via WeChat, I do not believe that YAU was truthful during this interview.

HENRY YAU's Dissemination of Confidential Government Information to CC-1

32.    Based on my review of publicly available information, I know that CC-1 is a Flushing resident who was recently a candidate for City Council in New York City and the New York State Assembly.  As further discussed below, investigation has revealed that HENRY YAU, the defendant, on multiple occasions provided information from confidential law enforcement databases to CC-1.  During the same timeframe, YAU also received favors from CC-1, including tax advice from CC-1's accountant.

33.    Based on my participation in the court-authorized search of the personal cellphone of HENRY YAU, the defendant, seized in or around June 2024 (the "YAU Personal Cellphone"), I know that the YAU Personal Cellphone exchanged numerous messages with a WhatsApp account with a username matching the name of CC-1 and with a photograph matching the appearance of CC-1 (the "CC-1 WhatsApp Account'), as well as a WeChat Account with a username matching the name of CC-1 (the "CC-1 WeChat Account").  In messages between the YAU Personal Cellphone and the CC-1 WhatsApp Account, the user of the CC-1 WhatsApp Account also provided to YAU the date of birth of CC-1.  Below are some of the messages exchanged between the YAU Personal Cellphone and the CC-1 WhatsApp Account:

a.    On or about June 17, 2018, the YAU Personal Cellphone sent a message to the CC-1 WeChat Account stating: "Bro if you have any frds reporting to immigration from now on.  Let me know before and I'll check it for you and tell u if they gonna take them into custody or not if they report" | "cause trump said take everyone bro."  Based on my training, experience, and participation in this investigation, including my review of other messages, it appears that YAU was offering to tell CC-1 whether any non-citizens reporting to immigration-related appointments will be taken into custody when they report.

b.    On or about February 23, 2019, the CC-1 WeChat Account sent a message containing an image of a New York State driver's license in the name of an individual ("Victim-2") and the message: "Can I help me check her status bro . Applied for green card back on 2014 still no results."

c.    The YAU Personal Cellphone responded on or about March 20, 2019 with a photograph of a computer screen depicting information about Victim-2 from a USCIS database that contains information about immigration-related applications filed by aliens.  The YAU Personal Cellphone also sent messages stating: "She's ok for now.  Her asylum status was granted | She Applied for green card | 2014."  The CC-1 WhatsApp Account responded: "Yes but she said is been long time | Anything holding it ?"  The YAU Personal Cellphone responded:

"Yea looks like it went through a frauds check." The CC-1 WhatsApp Account responded: "What do I mean" | "Do u". The YAU Personal Cellphone then responded with additional screenshots from a USCIS database, as well as the question "Did she change her name and address in 2016 with the green card application?" Based on my conversations with a DHS-OIG investigator with access to audit trail records, I know that YAU's login credentials were used to query Victim-2 in USCIS's database on or about March 20, 2019—the same date that the screenshots were sent to CC-1.

        d.      On or about June 20, 2019, the CC-1 WhatsApp Account sent messages to the YAU Personal Cellphone stating: "Bro , can you help me Run this ? check her status for me" | "It's important for me she owes me fd $$." The CC-1 WhatsApp Account then sent a photograph of a driver's license for a particular individual ("Victim-3"). The YAU Personal Cellphone responded: "Wechat." The CC-1 WeChat Account and the YAU Personal Cellphone then exchanged the following messages:

**CC-1 WeChat Account:**      Just snap pictures of her information on your screen

**YAU Personal Cellphone:**      Yea bro. Ask me here | WhatsApp not safe

**CC-1 WeChat Account:**      Ok | Can you run her | Send me any info u have on her

**YAU Personal Cellphone:**      She's applying for asylum now | He came in on a visitor visa | If they deny the asylum, I can arrest her her | Because she will have been a visa overstay

**CC-1 WeChat Account:**      Can you snap a picture of her info on screen | It's expired on 9/27/19

**YAU Personal Cellphone:**      Yea Ill ask caudse [misspelling for "cause"] I had my coworker run it for me cause I'm not in office.  Yes the visitor visa expires on 9/27/19

**CC-1 WeChat Account:**      ok | Send me ASAP thanks bro

**YAU Personal Cellphone:**      [Photograph][4] | That her

**CC-1 WeChat Account:**      yes

Based on my conversations with investigators with DHS-OIG, I know that on or about June 20, 2019, YAU queried for information about Victim-3 in USCIS's databases.

        e.      On or about October 12, 2021, the CC-1 WeChat Account sent messages to the YAU Personal Cellphone, stating: "Can you help me check travel history for a person." The YAU Personal Cellphone responded: "I'm flying most of the time to Haiti" | "In a remote location.  Kinda tough.  Let me text my frd or [name of co-conspirator not named herein]." The

---

[4] This photograph was no longer available on the YAU Personal cellphone at the time of the search by law enforcement.

CC-1 WeChat Account responded: "[name of co-conspirator not named herein] said he can't do it" | "It's urgent bro plz." | "Very important." | "Bro." The YAU Personal Cellphone responded: "My signal isn't good. I'm in the desert with make shift camps. Waiting for text back."

        f.     Between in or around 2016 and in or around 2021, YAU and CC-1 exchanged numerous messages in which YAU occasionally asked for favors from CC-1, including: (1) asking tax-related questions to CC-1, and having CC-1 provide advice from CC-1's accountant (YAU: "If Someone is giving me a 1099 on 100k cause I invested and got that as profit. Is there a way to not pay taxes on it?" | CC-1: "Let me check with my cpa tomorrow"); and (2) getting into business together for obtaining food cart permits ("CC-1: Lets make $$" | "YAU: Bro how much u think a food cart license person will rent the license for?").

<u>HENRY YAU's Dissemination of Confidential Government Information to CC-2</u>

        34.     Based on my review of publicly available information and my conversations with other law enforcement officers, I know that CC-2 is a former employee at a school in the United States who pleaded guilty in or about June 2020 to wire fraud, in violation of 18 U.S.C. § 1344, relating to CC-2's participation in a scheme to obtain admission slots for unqualified international students.

        35.     Based on my participation in the court-authorized search of the YAU Personal Cellphone, I know that the YAU Personal Cellphone exchanged numerous messages with a WeChat account with a username containing the initials of CC-2 (the "CC-2 WeChat Account"). In the messages between the YAU Personal Cellphone and the CC-2 WeChat Account, the CC-2 WeChat Account identifies the user of the account by the name of CC-2 and communicates to YAU on particular dates when CC-2 was flying into and out of the United States in a way that matches border crossing records for CC-2. Below are some of the messages exchanged between the YAU Personal Cellphone and the CC-2 WeChat Account:

        a.     On or about December 26, 2018, the CC-2 WeChat Account and the YAU Personal Cellphone exchanged the following messages:

| | |
|---|---|
| **YAU Personal Cellphone:** | Are you flying outside the US? |
| **CC-2 WeChat Account:** | I was thinking you may not get back to me [Grimace] |
| **YAU Personal Cellphone:** | Or you traveling inside the US? |
| **CC-2 WeChat Account:** | Going to Europe \| It was a vacation I have planned \| Remember I told u before ? \| The problem is I don't have the contact info of the officer and agency \| So I have no way to find out |

        b.     The YAU Personal Cellphone and the CC-2 WeChat Account then engage in a voice call for approximately one minute and 29 seconds before exchanging the following messages:

| | |
|---|---|
| **CC-2 WeChat Account:** | [Name of CC-2] |

| | |
|---|---|
| **YAU Personal Cellphone:** | Date of birth? |
| **CC-2 WeChat Account:** | [Date of birth of CC-2] | Am I clear ? |
| **YAU Personal Cellphone:** | Bro. I check. And I don't see anything restricting you bro |
| **CC-2 WeChat Account:** | Cool , then I am going to have a vacation . Deal with the shit when I come back |

        c.       On or about December 30, 2018, the CC-2 WeChat Account and the YAU Personal Cellphone exchanged the following messages:

| | |
|---|---|
| **CC-2 WeChat Account:** | If things are out of control , you think they will get me in HK or oversea ? Or unlikely ? |
| **YAU Personal Cellphone:** | It's ok because China doesn't have a extradition treat with the US |
| **CC-2 WeChat Account:** | But Hong Kong has | They won't do extradition for small case , right ? | Only for certain high profile case ? |
| **YAU Personal Cellphone:** | That's usually the case |
| **CC-2 WeChat Account:** | I see . | I will meet u in China or HK haha |
| **YAU Personal Cellphone:** | Of course. Haha |

Based on my training, experience, and participation in this investigation, it appears that CC-2 asked YAU to check law enforcement databases to see whether CC-2 would be prohibited by law enforcement from departing the United States because of a potential criminal investigation. Later on, CC-2 and YAU discussed whether it is likely that the United States would be able to extradite CC-2 from Hong Kong.

        d.       On or about February 22, 2019, the CC-2 WeChat Account sent a series of audio files to the YAU Personal Cellphone requesting that YAU run certain checks relating to "collections" for a "cousin." The YAU Personal Cellphone asked: "When's she coming back in?" The CC-2 WeChat Account responded: "Feb 28." The CC-2 WeChat Account later asked: "Any restriction ?" The YAU Personal Cellphone responded: "I didn't find any restriction on customs coming back to US."

        e.       On or about January 13, 2020, the CC-2 WeChat Account and the YAU Personal Cellphone exchanged the following messages, including audio files in Cantonese that have been translated into English drafts below:

| | |
|---|---|
| **CC-2 WeChat Account:** | [Audio File: I signed.  Yes, I logged in and gave me a very simple message, but that is nothing, in fact, the most important thing I want to know, because I don't remember |

that I told you before, I have a legal trouble, the lawyer, this time I go back and I will deal with this matter, I will find a lawyer in a few days to deal with this matter, this is the previous legal trouble, I told you last year, I want to know if I will have any problems at the airport now? If there is a problem, I will be ready, if you can, you help me see if there is any problem, I am not trying to leave anything, I just want to be ready, if you can check it out for me, it would be best thank you HENRY.]

. . .

**YAU Personal Cellphone:** Ok 👍 Hey bro. Yea i will check | [Audio File: What did you say happened to you last year? Tell me again. What is it? Are they investigating you or what?]

**CC-2 WeChat Account:** [AUDIO FILE: Investigate: About those school admission scandals, those lawyers called me back because they said they wanted to interview me, but they said it wasn't a big deal, not very serious, because if it was serious, I couldn't go, anyway, I wanted to know what was going on now, because I didn't want to be surprised by then, you know]

. . .

**YAU Personal Cellphone:** [AUDIO FILE: I'm looking at that thing, and maybe they're blocking you from coming in from the global entry because you have that one that is an active investigation] [AUDIO FILE: Do you remember those admission scandals you told me last year?] [AUDIO FILE: There's another investigation into the matter]

**CC-2 WeChat Account:** [AUDIO FILE: Did you see that your system saw that I had a watchlist that I should be delayed or arrested at the airport?"] [AUDIO FILE: Because you know I'm trying to cooperate, I'm going back, or I wouldn't have gone back or bothered them, you've got about 16 to find them, but I don't want to be surprised at the airport"]

**YAU Personal Cellphone:** [AUDIO FILE: They're just saying it's like an operational investigation] [AUDIO FILE: I understand that this is an operational investigation, and that doesn't mean anything bad, but it could be a violation of your international entry status because they don't want anyone to be on the international entry list in the investigation.] [AUDIO FILE: But it doesn't mean that you're going to be detained or in trouble]

| | |
|---|---|
| **CC-2 WeChat Account:** | [AUDIO FILE: Trouble you, trouble you, trouble me, you help me see, should it be okay? If you're OK, you're going to help me check it, it's really bothering you"] |
| **YAU Personal Cellphone:** | [AUDIO FILE: No need to be afraid.  No need to be afraid. Yes, that's what I'm seeing in the system.  But I don't know what they want to do until I speak to an agent in charge of the case.] [AUDIO FILE: You know for the updates of the case, you know. I don't know the actual investigator or officer in charge of the case. I don't know what they are going to do. Are you flying into LA or JFK.] [AUDIO FILE: This looks like a California investigation.] |
| **CC-2 WeChat Account:** | [AUDIO FILE: Hey, hey, HENRY HENRY, you see I have an Active Investigation, but you don't know what's gonna happen next, and you don't know what he's gonna do.] \| Is it like a warrant ? \| LAx |
| **YAU Personal Cellphone:** | No not a warrant \| [AUDIO FILE: Just an investigation. Not a warrant. Not a warrant.] |
| **CC-2 WeChat Account:** | I see \| [AUDIO FILE: OK, do you usually call the agent in these cases and ask him what he wants, or what he usually does? At the airport, is there something that won't necessarily happen to me? It's just an investigation, isn't it?] |
| **YAU Personal Cellphone:** | [AUDIO FILE: Yeah, just an investigation pretty much. They looking into it. They might have you as a witness. It's not 100% you're the subject of the investigation. It's just like, they're investigating something and you're the witness.] |
| **CC-2 WeChat Account:** | I see \| Thank you for checking \| [AUDIO FILE: Well, thank you, Henry, I deleted my message with you, so as not to cause any trouble, thank you] |

Based on the messages between the YAU Personal Cellphone and the CC-2 WeChat Account, I understand the foregoing back-and-forth to have involved, in sum, CC-2 asking YAU to check law enforcement databases to see whether CC-2 would potentially be arrested upon entering the country.  YAU responded that CC-2 was flagged in a law enforcement database relating to an investigation based in California, but the database did not indicate that CC-2 had any outstanding arrest warrants.  Based on my conversations with other law enforcement officers, I know that between in or around 2016 and in or around 2020, CC-2 was being investigated by FBI agents based in California.

      f.      On or about January 13, 2020—the same date that CC-2 asked YAU for information about whether CC-2 is under investigation—the CC-2 WeChat Account also sent an audio file to the YAU Personal Cellphone about potential real estate investment opportunities: "And the last time you said you wanted to see the apartments? I went to Zhuhai and Zhongshan this time, and I thought they had potential, so you can go there next time, and if you haven't bought them yet, they haven't said they're expensive yet, and Zhongshan and Zhuhai, because I think those in Shenzhen and Guangzhou are too expensive, and you can look at the apartments that I think should have high potential."  Based on my training, experience, and participation in this investigation, I understand these messages to involve, in substance, CC-2 offering to assist YAU with real estate opportunities in China simultaneously with CC-2 asking YAU to provide information about whether CC-2 will be detained or arrested when flying into the United States.

<u>HENRY YAU's Dissemination of Confidential Government Information to CC-3</u>

      36.      Based on my participation in the court-authorized search of the YAU Personal Cellphone, I know that the YAU Personal Cellphone exchanged numerous messages with a Signal account and WeChat account associated with a particular phone number (the "CC-3 Signal Account" and the "CC-3 WeChat Account").  In the messages between the YAU Personal Cellphone and the CC-3 Signal Account, the user of the CC-3 Signal Account sent photographs indicating that CC-3 is the user of the CC-3 Signal Account, and as further discussed below, CC-3 later appears to ask YAU to check on the status of CC-3's application with DHS's Global Enrollment System.

      37.      Below are some of the messages exchanged between the YAU Personal Cellphone and the CC-3 Signal Account:

      a.      On or about May 24, 2019, the YAU Personal Cellphone sent to the CC-3 Signal Account a screenshot of a DHS Office of Security document titled "MEMORANDUM FOR CLASSIFIED COURIERS," portions of which are depicted below, including the bottom of the screenshot reflecting that YAU's DHS email account was also open:





     b.     The YAU Personal Cellphone then sent a message stating: "They are making me a classified courier for my field office because of my intelligence work."  The CC-3 Signal Account responded: "Haha more work for you to do."

     c.     Between on or about June 18, 2019 and on or about June 19, 2019, the YAU Personal Cellphone exchanged a series of messages with the CC-3 Signal Account, including the following:

**YAU Personal Cellphone:**    With stuff like that, ask me here | What's his last name

**CC-3 Signal Account:**    [last name of individual ("Victim-4")] | Sorry bro | It didn't cross my mind since u can do it legally

**YAU Personal Cellphone:**    Yeah but I always air on the side of caution [SCREENSHOT of W-2 for Victim-4 containing a social security number | That's a weird ass SS# | You got a DOB?

**CC-3 Signal Account:**    Let me check don't know it . . I thought name and ss was good enough

**YAU Personal Cellphone:**    I can run the SS | Give me a sec

**CC-3 Signal Account:**    I was told he is a green card holder

**YAU Personal Cellphone:**    Ok [SCREENSHOT of photograph of Victim-4]



**YAU Personal Cellphone:**    He just got his green card in 2016 | After coming here illegally. This is how fucked the US is | Basically he got a green card

through his US citizenship child | his US citizen child applied for him.  The term anchor babies

**CC-3 Signal Account:**        Let me ask is it him

**YAU Personal Cellphone:**      Only way to arrest him now if he gets convicted of a crime

**CC-3 Signal Account:**        That's why so many ppl try to bring their kids here

**YAU Personal Cellphone:**      No actually they just come here illegal and pop babies. Once kid is born here. It's automatically a US citizen

**CC-3 Signal Account:**        But they are pregnant in there country most of the time | He is [name of individual] staff | He is trying to Extort money from him he got hurt at work | He hurt his hand | [name of individual] paid him 2 month salary for it.  | When he return to work he doesn't show up everyday and expect to be paid everyday

**YAU Personal Cellphone:**      Of course.  Welcome to America!

**CC-3 Signal Account:**        And if [name of individual] doesn't pay him he said he will sue | He thinks it's his daughter that put him up to it

**YAU Personal Cellphone:**      Well he already benefited from getting here illegally | He broke the rules and he got away with it now he's trying to do the same again

**CC-3 Signal Account:**        So fucked up | So [name of individual] want to scare him and say to just back off

**YAU Personal Cellphone:**      Give me his spouse name or wife

**CC-3 Signal Account:**        Want to do a drive by and pay him a visit ? Will try to get for u

**YAU Personal Cellphone:**      I'll take them if they takable

      d.     Based on my conversations with a representative of DHS-OIG with access to audit trail logs for YAU, I know that YAU's credentials were used to run a search for Victim-3 in USCIS's databases on or about June 18, 2019 and on or about June 19, 2019.  Based on my training, experience, and participation in this investigation, the foregoing back-and-forth involves, in sum and substance, CC-3 asking YAU to check immigration databases for the immigration status of Victim-4, who had been allegedly trying to extort an employer after being injured at work.  YAU then checked USCIS's databases for Victim-4 and informed CC-3 that Victim-4 had gained permanent residency in 2016 after entering the country illegally because Victim-4 had a child that was born in the United States and had obtained citizenship.  YAU offers to try to arrest Victim-4 and Victim-4's spouse ("I'll take them if they takable.").

      e.     On or about June 19, 2019, the YAU Personal Cellphone and the CC-3 Signal Account exchanged the following messages, among others:

**CC-3 Signal Account:**      Hey bro don't forget to run the girl if you can today

**YAU Personal Cellphone**:      The person that sponsored that guy is [name of individual] | Hold up.  That's the wife | Daughter name : [name of Victim-5] | Do you have an approximate DOB or age? [screenshot of computer screen] Found her [screenshot of computer screen depicted below]



**YAU Personal Cellphone:**      She's a US citizen as of 2015

**CC-3 Signal Account:**      Yea she did fake marriage | From what I heard

**YAU Personal Cellphone**:      Doesn't matter.  They granted her and fake marriage is hard to prove.

**CC-3 Signal Account:**      U can threaten her about it.  Any last know address?

      f.      Based on my conversations with a representative of DHS-OIG with access to audit trail logs for YAU, I know that YAU's credentials were used to run a search for Victim-5 in USCIS's databases on or about June 18, 2019 and on or about June 19, 2019.

      g.      Between on or about July 25, 2019 and on or about July 26, 2019, the CC-3 Signal Account exchanged the following messages with the YAU Personal Cellphone, among others:

**CC-3 Signal Account:**      [screenshot of a name, address, and phone number] | Hey bro can u run this guy for me | I don't have his DOB | No Rush | Never mind | I got the 411 on his ass already

**YAU Personal Cellphone**:    Ok.  I was at training today.  Couldn't run it.  Didn't go into the office.

**CC-3 Signal Account**:    It's ok | This is the guy that [name of Victim-6] was seeing since jan 2018

**YAU Personal Cellphone**:    [Victim-6] was seeing?

**CC-3 Signal Account**:    Yes | She is still with him now

**YAU Personal Cellphone**:    [Victim-6] | So she was cheating on you | Guess it was her own guilty conscience

**CC-3 Signal Account**:    I got into her phone | Recorded her chats with him and pics | Fucking crazy

. . .


**CC-3 Signal Account**:    Can u run a phone number to see who it is registration to ?

. . .

**YAU Personal Cellphone**:    What's the phone number?

**CC-3 Signal Account**:    [phone number]

. . .

**YAU Personal Cellphone**:    [screenshot below]



h.      The YAU Personal Cellphone then said: "That number didn't come back to any one person."  Based on my training, experience, and familiarity with law enforcement databases, I know that the screenshot sent by the YAU Personal Cellphone to the CC-3 Signal Account appears to have been generated by a law enforcement database that pulls from both public and non-public sources to provide information about phone numbers, including possible subscriber and provider information.

i.      Between on or about July 28, 2019 and on or about July 30, 2019, the CC-3 Signal Account repeatedly sent messages to the YAU Personal Cellphone asking for information about Victim-6, including the following messages:

**CC-3 Signal Account:**          Can u check when and where she came in at ? | If I send u her info? | Don't have her passport | Just her hk id which has all the info [screenshot of Victim-6's Hong Kong identification card]

. . .

**CC-3 Signal Account:**          Can you run when [Victim-6] came into usa and at which entry point? | Hey bro don't forget | Run [Victim-6] Chinese name thru the system and see when and where she came in at for me

        j.     The YAU Personal Cellphone then sent a photograph of a screenshot of Victim-4's name, date of birth, citizenship, passport numbers, gender, flight history in and out of the country, and border crossing history.  Later on in the conversation, the YAU Personal Cellphone sent messages to the CC-3 Signal Account: "Do not disseminate that pic" | "Do not send anyone else that pic" | "I don't like to leave records."

        k.     Based on my training, experience, and familiarity with law enforcement databases, I know that the screenshot reflects a query of Victim-5 within DHS's border-crossing databases that keep records of border crossings by individuals.

        l.     On or about July 23, 2021, the YAU Personal Cellphone sent a screenshot to the CC-3 WeChat encrypted messaging application of what appears to be a check on the status of a Global Enrollment System application by CC-3:



        m.     Between in or about 2017 and in or about 2023, the YAU Personal Cellphone and the CC-3 Signal Account exchanged numerous messages indicating that YAU and CC-3 are attempting to make money together through various business opportunities.  For example, in or about June 2019, the YAU Personal Cellphone and the CC-3 Signal Account

exchanged numerous messages discussing a business venture to become an ammunition supplier to the U.S. Government.  YAU contacted another individual who appeared to be a General Services Administration ("GSA") contracting officer representative (the "GSA Representative") with questions from CC-3: "[CC-3] has some questions. You willing or want to jump in with him in obtaining government contract for ammo. If so, we need to know who is the current supplier. How can we get into the bid process?  How does the bidding work? And old bids we can look at? Getting the company or a ammo company to be GSA approved."  The GSA Representative responded: "As a contracting officer's representative, I don't think I can | It's off limits until I'm retired."  The YAU Personal Cellphone responded: "Talking about under the radar stuff. Informational purposes Maybe non officially."  The GSA Representative responded: "I think the idea is over the top and out of my league."

WHEREFORE, I respectfully request that a warrant be issued for the arrest of HENRY YAU, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.


/s/ Robiel Ande, by SDA with permission
_____
Robiel Ande
Special Agent
Federal Bureau of Investigation


Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 19th day of November, 2024.

_____
THE HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York